**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nannette G. Hummel, | No. CV-16-04381-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| Maricopa County Adult Probation Department, | |
| Defendant. | |

After holding a bench trial on July 26 and 27, 2021 (Docs. 104-05), the Court now provides its Findings of Fact and Conclusions of Law.

**I.      BACKGROUND**

In this dispute between former employer and employee, Plaintiff Nannette G. Hummel sued Defendant Maricopa County Adult Probation Department ("APD"), alleging violations of Title I of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* for failure to accommodate her disability.

Plaintiff began working as a probation officer for APD in 2005. Prior to starting, APD required her to sign a Certificate of Understanding outlining multiple conditions of employment, including that she would not: 1) "knowingly initiate a personal or commercial relationship with a probationer, former probationer, parolee, or a person with a felony record or lawless reputation;" and 2) "engage in outside or other employment . . . which conflicts with the full and proper discharge of the duties and responsibilities of my APD employment." (Defendant's Trial Exhibit ("Def.'s Trial Ex.") 51.)

On October 16, 2012, APD terminated Plaintiff's employment. While unemployed, Plaintiff started a bail bond business called Bailzona Bail Bonds, LLC ("Bailzona"). She then successfully appealed her termination, and on June 10, 2013, Defendant reinstated her at the Mesa Probation Service Center. On her first day, Plaintiff met with Michael Cimino, then Deputy Chief Probation Officer. He informed Plaintiff that APD knew about Bailzona, and that her operation of the business violated APD's Outside Employment and Education Policy, which prohibits employment with a "high probability of contact with probationers [where] the nature of that contact would create a conflict with the employee's position or duties as a probation department employee and/or officer of the court." (Def.'s Trial Ex. 53.) Mr. Cimino further advised Plaintiff that if she was going to continue to operate the business, she needed to fill out a form requesting permission. Later that day, Plaintiff's immediate supervisor, Lisa Roubicek, again informed her that APD knew about Bailzona, that it violated APD's policy, and asked Plaintiff to fill out the request form. Plaintiff did not fill out the request form on either occasion.

Days after her reinstatement, Plaintiff requested and APD granted her transfer to the Northport Office. On June 18, 2013, Plaintiff's first day at the Northport Office, she met with her new direct supervisor, Janet Parker, who provided Plaintiff with the Outside Employment and Education Policy as well as the request form. She again advised Plaintiff that she needed to fill out the form and have it approved by APD in order to operate Bailzona while employed by APD.

Plaintiff started vacation and was out of the office from June 20-23, 2013. The day before her vacation, Ms. Parker emailed Plaintiff requesting that she fill out the request form prior to the close of business. Plaintiff did not fill out the form. She then worked June 24 but started another vacation from June 25 through July 22, 2013. While out of the office, Plaintiff requested Family and Medical Leave Act ('FMLA") leave to take care of her daughter, who was having surgery for a deviated septum. (Def.'s Trial Ex. 55.) APD denied the request, so Plaintiff used her sick time. Subsequently, on July 31, 2013, Plaintiff submitted a request for FMLA leave from August 15, 2013 through November 15, 2013 in

order to undergo and recover from partial knee replacement surgery. (Def.'s Trial Ex. 56.) APD approved the request, granting Plaintiff FMLA leave through November 7, 2013. APD's approval letter included instructions that Plaintiff must "present a fitness-for-duty statement from your treating health care provider to be restored to employment" and stated that "[a] list of the essential functions of your position is attached. The fitness-for-duty statement must address your ability to perform these functions." (Def.'s Trial Ex. 57.) However, the essential functions form is not part of the exhibit and Plaintiff testified that she does not recall receiving it. (Trial Transcript ("Trial Tr.") at 129:16-18.) Plaintiff underwent surgery on August 16, 2013.

While on sick leave and FMLA leave, Plaintiff continued to operate Bailzona. On July 5, 2013, Plaintiff wrote a $2,400 bond for Jordan David Noyes, who was charged with violating his probation. (Def.'s Trial Ex. 52.) Subsequently, on August 27, 2013, Plaintiff appeared in Maricopa County Superior Court on two matters related to bond exoneration hearings for Mr. Noyes. The first hearing was for the $2,400 bond for the probation violation and the second was for a $3,600 bond for assault. (Def.'s Trial Ex. 58.)

On November 5, 2013, Plaintiff emailed APD Human Resources Analyst Mikisha Steel to inform her that she needed to extend her medical leave of absence until January 6, 2014. (Def.'s Trial Ex. 59.) In support, Plaintiff attached a doctor's note from October 31, 2013 which also indicated that Plaintiff would be able to return to work on January 6, 2014. Barbara Broderick, Chief Probation Officer, granted the request for additional leave, while also informing Plaintiff that absences after January 6 would be considered unexcused. She further advised Plaintiff that in order to return to work, she "must submit medical documentation clearing [her] to perform the essential functions of [her] job." (Def.'s Trial Ex. 60.)

On January 6, 2021, Plaintiff arrived at work, but Ms. Steel informed her that she needed to leave because she had not provided the required medical clearance. Plaintiff argued that the October 31 doctor's note, which stated that she would be fit to return to the office on January 6, 2014, provided the necessary documentation. Ms. Steel told Plaintiff

that this note was insufficient and clarified that she needed a doctor to fill out the specific "essential functions form," which she sent to Plaintiff later that day. Because Plaintiff could not schedule a doctor's appointment until January 27, 2014, Ms. Broderick extended her leave until that date but informed her that any absence after January 27 would be unauthorized. (Def.'s Trial Ex. 62.)

Plaintiff visited her doctor on January 27, who diagnosed her with hip bursitis. He filled out the essential functions form with his findings that Plaintiff had physical limitations that would prevent her from performing many of the essential aspects of her job. He further found that Plaintiff needed an additional two weeks until February 13, 2014 before she could return to full duty. (Def.'s Trial Ex. 63.) Plaintiff emailed APD the doctor's assessment as well as a letter requesting an accommodation until February 13. (Def.'s Trial Ex. 63.) She also informed APD that her next doctor's appointment for reevaluation was on February 24. (Def.'s Trial Ex. 63.) The next day, January 28, 2014, Ms. Broderick sent Plaintiff a letter denying her extension request and informing her that as of January 28, Plaintiff's absences were unexcused and that pursuant to the Judicial Merit System Rules, she would be "automatically considered to have resigned" if she was absent three straight days. (Def.'s Trial Ex. 64.)

In response, Plaintiff emailed Ms. Broderick on January 29 requesting to use her accumulated vacation and sick leave for paid time off until she was medically cleared. (Pl.'s Trial Ex. 7.) Ms. Broderick was never made aware of this request. On January 30, 2014, Ms. Broderick sent Plaintiff a letter notifying her that APD was separating her from her employment for job abandonment. (Pl.'s Trial Ex. 16.) APD subsequently terminated Plaintiff without prejudice, allowing her to reapply for her position within one year if she received the proper medical clearance. (Pl.'s Trial Ex. 16.)

Plaintiff subsequently filed this lawsuit alleging that Defendant violated the ADA. She requested damages as well as reinstatement. In 2018, the Court granted Defendant's Motion for Summary Judgment on all claims, but the Ninth Circuit reversed and remanded the matter (Doc 66). Plaintiff then filed a Second Amended Complaint naming Michael

Cimino, the current Chief Probation Officer, as the lone Defendant and requesting reinstatement as her sole remedy (Doc. 98). The Court subsequently held a bench trial on two issues: 1) whether Plaintiff's request for an additional accommodation was reasonable; 2) whether Plaintiff's reinstatement to her previous position would be futile due to her operation of her bail bond business. In conjunction with the bench trial, the parties filed Trial Memoranda (Docs. 86, 90) and Proposed Findings of Fact and Conclusions of Law (Docs. 87, 91). The Court will also address Defendant's argument, raised for the first time in its Trial Memoranda, that Plaintiff's operation of Bailzona is a defense on the merits to her ADA claim.

## II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

When an employee requests an accommodation or the employer becomes aware of the need for one, "the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002) (citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000) (en banc), *vacated on other grounds*, *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)). Although an employee must "inform the employer of the need for an adjustment due to a medical condition," he need not use any "particular language" to do so. *Id.* "Determining whether a proposed accommodation… is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243,1247 (9th Cir. 1999).

The scope of reasonable accommodations under the ADA is broad and includes "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position." 42 U.S.C § 12111(9)(B). An employer does not have a duty to "provide an employee the accommodation he requests or prefers" and must only "provide some reasonable accommodation" for the employee. *Zivkovic*, 302 F.3d at 1089. Employers additionally are not required to "create a new position to accommodate a disabled employee." *Wellington v. Lyon Cty. Sch. Dist.*, 187 F.3d 1150, 1155 (9th Cir. 1999). In

some cases, placing an employee on medical leave may be a reasonable accommodation. *See Dark v. Curry Cty.*, 451 F.3d 1078, 1090 (9th Cir. 2006). An employee, however, is not required "to show that a leave of absence is certain or even likely to be successful" in treating the disability for it to be a reasonable accommodation. *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1136 (9th Cir. 2001). Although leave "of unspecified duration may not be a reasonable accommodation . . . where the employee will not be able to return to his former position and cannot state when and under what conditions he could return to work at all," an employer is required to at least "consider this option." *Dark*, 451 F.3d at 1090.

### A. Plaintiff's Operation of Bailzona is not a Defense on the Merits

Defendant argues that Plaintiff's operation of Bailzona after her reinstatement is a defense on the merits to her ADA claim. (Doc. 86 at 2-3.) *Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019) held that the Court must apply a "but for" causation standard when evaluating ADA claims. Under the "but for" causation standard, "an action 'is not regarded as a cause of an event if the particular event would have occurred without it.'" *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 347 (2013). Defendant thus contends that because it would have fired Plaintiff for her operation of the bail bond business, her disability cannot be a but for cause of her termination. The Court disagrees. In order to terminate Plaintiff for the bail bond business, Defendant needed to conduct a full investigation, which it did not do. Accordingly, the termination letter expressly cites Plaintiff's job abandonment as the cause of termination but does not mention Plaintiff's bail bond business. In fact, Ms. Broderick testified that she "was not pursuing the bail bonds" with regards to Plaintiff's termination. (Videotaped Deposition of Barbara Anne Broderick ("Broderick Tr.") at 53:21-25.) Because Defendant did not have the grounds to terminate Plaintiff for the bail bond business, it follows that it did not have mixed motives for its decision to terminate Plaintiff's employment, and thus the Court will not consider Plaintiff's operation of the bail bond business as a defense on the merits.

### B. Plaintiff's Request for an Additional Accommodation was Unreasonable

Nonetheless, the Court finds that Plaintiff's request for an extension of medical leave or a different accommodation on January 27, 2013 was unreasonable. APD produced evidence that Plaintiff's continued absence was a hardship for the other probation officers at the Northport location. *See Dark*, 451 F.3d at 1090 (extended medical leave is not a reasonable accommodation where it poses an undue hardship on the employer). Ms. Broderick credibly testified about the need to fill the position and explained that the burden to cover an officer's caseload who is out on extended leave falls on the other officers. (Broderick Tr. at 15:22-16:6.) Mr. Cimino explained that APD granted Plaintiff's transfer request because Northport needed an additional probation officer and planned to give Plaintiff cases from other overburdened officers. Plaintiff contends that Northport never provided her with a caseload and thus her absence was not a burden, but Mr. Cimino testified that Plaintiff went on vacation before Defendant could assemble the cases and that Northport had a continuous need for an officer throughout Plaintiff's absence. (Trial Tr. at 198:1-200:24.)

Plaintiff further asserts that her accommodation request was not an undue hardship on Defendant because it was limited to two weeks. (Trial Tr. at 61:24-62:15.) However, the evidence shows that Defendant had ample reason to believe that Plaintiff would not be healthy enough to return to work by that date, and that her absence would last indefinitely. *See Dark*, 451 F.3d at 1090 ("recovery time of unspecified duration not a reasonable accommodation where employee will not be able to return to his former position and cannot state when and under what conditions he could return to work at all."). First, Plaintiff's inaction and lack of communication leading up to and through January 6 call into question her stated desire to return to work. The Court does not find Plaintiff credible that she thought a doctor's note from October 31, which Plaintiff used to request her initial extension of medical leave, would be sufficient medical confirmation that she could perform her job's essential functions on January 6. Even if Plaintiff truly believed it was sufficient, the Court finds that Defendant was reasonable to not accept it. Regardless, Plaintiff could not return to work on February 12. Her doctor's appointment was scheduled

for February 24, which is the earliest that she could have produced the required essential functions form. (Def.'s Trial Ex. 63.)

Additionally, the January 27 essential functions report and Plaintiff's subsequent accommodations request illustrate that Defendant was reasonable to believe that Plaintiff would continue to need accommodations. By January 27, Plaintiff had not worked for almost seven months and had requested three extensions of her accommodations to recover from the surgery. Her doctor indicated that she could not lift more than ten pounds, sit for more than two hours straight, conduct field work visiting probationers at their residences, or many other essential aspects of her job. (Def.'s Trial Ex. 63.) Plaintiff attempts to downplay these restrictions, asserting that the doctor medically cleared her on January 6 and predicted the current limitations to only last until February 12. But as discussed *supra*, Plaintiff was not cleared on January 6 and still had significant limitations three weeks later on January 27.

Mr. Cimino and Ms. Broderick credibly explained how uncertainty regarding Plaintiff's return influenced their decision to not grant her an additional accommodation. Ms. Broderick testified that she "struggled… trying to get a sense of when will [Plaintiff] actually be back" and "didn't know when the game would kind of end from the doctor's perspective." (Broderick Tr. at 46:17-22; 47:8-20.) Mr. Cimino testified that he supported Ms. Broderick's decision because "it made sense to me given the multiple extensions, given the reality that we didn't have a clear end date in place and… there wasn't real clarity on when this was going to come to a close." (Trial Tr. at 223:13-17.) In light of Plaintiff's extensive absence, unclear timetable for her return to work, and unwillingness or inability to follow APD's procedures, Mr. Cimino and Ms. Broderick reasonably believed that Plaintiff's request for accommodations would continue beyond February 12.

Plaintiff points out that the language on the FMLA leave form states that in order to return to work, the medical substantiation "must be provided in advance" and thus it was bound to be a "mere prediction." (Def.'s Trial Ex. 57; Trial Tr. at 166:5-7.) This argument misinterprets the form's instructions. The medical substantiation would of course need to

be provided in advance of the employee's return. However, there is a difference between a doctor substantiating Plaintiff's ability to perform the essential functions of her job prior to her return and the unspecific, forward-looking prediction that Plaintiff provided to APD.

As an alternative to extending her medical leave, Plaintiff contends that Defendant should have temporarily reassigned her to the Presentence Division or Interstate Compact Outgoing Unit until she was cleared to perform the essential functions of her job. These positions did not require personal contact with probationers and were less physically strenuous than working as a probation officer in the field. Plaintiff produced evidence of four APD employees who previously received this accommodation while pregnant or recovering from injuries. (Pl.'s Trial Ex. 20; Trial Tr. at 34:20-36:8.) However, Mr. Cimino and Ms. Broderick both testified that Plaintiff's physical limitations described in the January 27 essential functions form would have prevented Plaintiff from performing such work. (Broderick Tr. at 92:21-93:3; Trial Tr. at 204:14-24.) While Plaintiff disputes this testimony, it is of no import because the Court finds that Plaintiff's request was unreasonable for the same reason as her request for additional leave. Plaintiff would not have been physically capable to work as a probation officer by February 12, and Defendant reasonably believed that her need for an accommodation would last indefinitely. While Plaintiff points to other employees who received such accommodations, she does not provide evidence that these employees had missed similarly substantial amounts of time – involving multiple requests for extensions of leave – when their accommodations were granted.[1] Providing Plaintiff with this accommodation would have amounted to reassigning Plaintiff for an indefinite time period. Defendant was under no such obligation. *See Sevcik v. Unlimited Constr. Servs.*, 462 F. Supp. 2d 1140, 1148–49 (D. Haw. 2006) (holding defendant is not obligated to make temporary light duty positions permanent to accommodate plaintiff's disability).

---

[1] Plaintiff argues that the temporary reassignment would not have burdened Defendant because she needed a refresher course on defensive tactics, which typically takes 3 weeks and thus she could not have returned to field work January 27 even if fully healthy. Once again, this does not address the issue of Defendant's reasonable belief that Plaintiff would not be sufficiently healthy in 3 weeks.

1    Finally, Plaintiff contends that she had a contractual right to use her accrued sick leave as an accommodation.[2] However, in response to the Court's question, Mr. Cimino clarified that APD's authority to grant or deny Plaintiff's request for sick leave is separate from Plaintiff's contractual right to be paid for her accrued sick leave. (Trial Tr. 245:22-246:10.) Therefore, Plaintiff's request to use sick leave is unreasonable for the same reasons as her other accommodation requests. Defendant did not know when the accommodation would end.

In sum, Plaintiff has failed to show by a preponderance of the evidence that her request for an additional accommodation was reasonable. The evidence illustrates that Plaintiff's absence from her job appeared indefinite, which was an undue burden on Defendant.

### C. Reinstatement Would be Futile

Even if Plaintiff's request for a third accommodation extension was reasonable, Plaintiff's continued operation of Bailzona bars her requested remedy of reinstatement. *McKennon v. Nashville Banner Publishing Co.* established that "it would be both inequitable and pointless to order the reinstatement of someone the employer would have terminated, and will terminate, in any event and upon lawful grounds." 513 U.S. 352, 362 (1995). Because Defendant did not do the necessary investigation, it did not have cause to terminate Plaintiff for the operation of Bailzona in January 2014. Therefore, Defendant must prove by a preponderance of the evidence that if Plaintiff was reinstated, Defendant would initiate the requisite investigation, and both find lawful grounds on which to terminate Plaintiff's employment and actually do so. *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759, 761 (9th Cir. 1996). The Court finds Defendant has met

---

[2] Ms. Broderick testified that she was not informed of Plaintiff's request to use sick leave or temporarily switch positions until she was healthy. To the extent Plaintiff argues that Defendant thus did not engage in the interactive process, the Court is unpersuaded. The failure to engage in the interactive process for a potential accommodation only may lead to liability where the "reasonable accommodation would have been possible." *Humphrey*, 239 F.3d at 1137–38. For the reasons discussed, Plaintiff's temporary reassignment or use of sick leave were not reasonable accommodations.

.

- 10 -

its burden of proof.

Here, the evidence shows that Plaintiff continued to fully operate Bailzona after her reinstatement in direct violation of the terms of her employment. Plaintiff testified that she accepted one new client, Jordan David Noyes, and wrote a bond for him in July 2013. (Trial Tr. at 81:16-83:23.) She also went to court on his behalf in August. (Trial Tr. 84:3-13.) Moreover, she admitted on cross-examination that, contrary to her direct testimony, she wrote bonds for other clients besides Mr. Noyes after her reinstatement.[3] (Trial Tr. at 92:2-8.) This evidence contradicts Plaintiff's testimony that she was in the process of winding the business down and only took on one new client after APD reinstated her in June 2013.

Plaintiff's operation of Bailzona violates the Certificate of Understanding that she signed as well as APD's Secondary Employment Policy. If Plaintiff had properly requested to continue operating Bailzona, APD would have denied the request due to the clear conflict of interest; however, Plaintiff did not even take the first step of submitting the request form. Plaintiff provided multiple reasons for not submitting the form, including that she planned to wind down the business, wanted her attorney to review the form, and felt harassed due to Ms. Parker's inclusion of Kristi Ward, the Division Director, on the June 19 email. (Trial Tr. 104:17-106:9, 110:4-111:19.) At the same time, Plaintiff explained that she continued operating the business because she had to close out certain liabilities and fulfill other obligations. (Trial Tr. 67:24-68:10.) The Court does not find these explanations credible. Plaintiff had multiple opportunities to inform Mr. Cimino or her other supervisors of any complications with winding down the business. Instead, she was unforthcoming and continued to write bonds and operate her business through at least August 2013 in direct violation of APD's policies.

Plaintiff's other explanations for her continued operation of the bail bond business are similarly unconvincing. Plaintiff testified that she only accepted Mr. Noyes as a client

---

[3] Defendant presented Plaintiff with additional bail bonds that appeared to be issued by Bailzona. Because these exhibits were not previously disclosed, they were not entered into evidence. However, they were permitted to be used as impeachment evidence. And during impeachment, Plaintiff admitted she had issued at least one other bond after reinstatement.

- 11 -

because she shared an office with his mother's friend, who asked that she write him a bond. Not wanting to explain to the woman that she was shutting her business down, Plaintiff agreed. (Trial Tr. at 68:18-69:7.) Even if the Court believes Plaintiff's testimony, it does not excuse her blatant violation of APD's terms of employment. And as revealed on cross-examination, Plaintiff accepted additional clients during that time.

Lastly, Plaintiff argues that her continued operation of the bail bond business is not a terminable offense because APD did not go through the required investigation and provide Plaintiff with an opportunity to defend her actions. This argument fails because it is irrelevant to the issue before the Court. Defendant does not contend that the bail bond business is an alternative reason to terminate Plaintiff's employment. Rather, it argues that reinstatement would be futile because upon Plaintiff's reinstatement, Defendant would conduct an investigation that would find that Plaintiff's conduct warranted termination. Mr. Cimino testified at length why Plaintiff's continued operation of the business – including writing bonds for a defendant who had violated his probation – created a conflict of interest, cast doubt on whether Plaintiff could be trusted with another person's freedom, and harmed the credibility of APD and the justice system as a whole. (Trial Tr. at 224:22-226:23.) Mr. Cimino further confirmed that if the Court did find in favor of Plaintiff and order her reinstatement, he would immediately place her on administrative leave and start an investigation. (Trial Tr. at 226:24-227:13.) Plaintiff disputes that an investigation would uncover termination-worthy conduct, pointing to Ms. Broderick's testimony that she would not terminate a hypothetical employee who "accepted no new clients, with one small exception in early July…" and who only "was processing the paperwork… when things were terminated." (Broderick Tr. at 101:20-102:10.) But Ms. Broderick's response to this hypothetical is not dispositive. Mr. Cimino, who is now Chief of Probation, indicated that he disagreed with this decision. (Trial Tr. at 242:3-12.) Moreover, the hypothetical does not reflect the evidence presented at trial. Plaintiff accepted more than one client while on leave, went to Court on at least one client's behalf, and gave no indication through her actions that she actually planned to wind down the business. Based on this evidence, the

Court finds that any investigation would show that Plaintiff engaged in conduct warranting the termination of her employment. Therefore, it would be futile to reinstate Plaintiff to her former position.

**IT IS THEREFORE ORDERED** finding Defendant is entitled to judgment on all of Plaintiff's claims.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment in favor of Defendant and close this case.

Dated this 26th day of August, 2021.

Honorable John J. Tuchi
United States District Judge